Vinod Nichani, SBN 277607
NICHANI LAW FIRM
1960 The Alameda, Ste. 100
San Jose, California 95126
Telephone: (408) 800-6174
Facsimile:  (408) 290-9802
vinod@nichanilawfirm.com

Evgeny Krasnov, *Pro Hac Vice Motion Forthcoming*
BUZKO KRASNOV
228 Park Avenue South
PMB 85451
New York, New York 10003
Telephone: (718) 557-9582
evgeny.krasnov@buzko.legal

*Attorneys for Plaintiff, Sarafan Mobile Limited*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **SARAFAN MOBILE LIMITED, a Hong Kong corporation,** | **Case No.** |
| **Plaintiff,** | |
| **v.** | **VERIFIED COMPLAINT** |
| **GOOGLE LLC, a Delaware limited liability company, and META PLATFORMS, INC., a Delaware corporation,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## NATURE OF ACTION

1.    This case is about bloated tech giants killing small businesses.

2.    Google and Meta dominate so much of the market for developer output that their actions have an outsized impact on the lives of independent developers.

3.    When such large entities fail to exercise due care in their business dealings, their power to destroy is absolute.

4.    Viktor Seraleev was a successful developer of Reely, a popular video editing tool

1
**VERIFIED COMPLAINT**

1   that provided users with professional templates, filters, and effects to create engaging and stylish

2   reels for social media. He published Reely and other apps under his company, Sarafan Mobile

3   Limited. Reely was available on the Google Play Store, generating over $15,500 in monthly

4   revenues. Then, the unthinkable happened: out of the blue, Seraleev received a notice from

5   Google that Reely had been removed from the Google Play Store due to a trademark infringement

6   complaint filed by Instagram. Just like that, Meta and Google had destroyed a flourishing

7   business, and Google provided no meaningful opportunity to challenge this decision.

8        5.     This blow was just the latest in a series of challenges for Seraleev. He faced a life-

9   altering crisis when Russia invaded Ukraine in February 2022. The invasion shocked his

10   conscience and upended his business, which relied on access to a global customer base through

11   the Google Play Store. Determined to distance himself from the conflict and avoid contributing

12   taxes to the Russian Federation, Seraleev made the swift decision to emigrate from Russia to

13   Chile, starting over in a new country.

14        6.     On June 13, 2024, Seraleev's world was turned upside down once more. Without

15   warning, he received a notification from Google stating that Reely would be removed from

16   Google Play due to an alleged trademark infringement complaint from Instagram LLC, a

17   subsidiary of Meta Platforms, Inc. The complaint claimed that Reely's icon infringed upon

18   Instagram's Reels logo. Despite the baseless nature of this claim, Google hastily acted on it in the

19   harshest way possible – deleting Reely from Google Play on June 25, 2024, and disregarding the

20   evidence and meticulous defenses Seraleev presented to demonstrate his app's originality and

21   compliance with all trademark laws.

22        7.     Meta's actions were equally unjust. By filing an unfounded trademark complaint,

23   Meta leveraged its considerable influence to disrupt a Sarafan's business. Initially, Meta tried to

24   hide the fact that it had filed the complaint. When questioned, Meta lied and denied that the email

25   it used to file the complaint with Google belonged to Meta. This further complicated Seraleev's

26   attempts to resolve the issue. Meta's deception was uncovered only after Seraleev painstakingly

27   investigated the matter himself and confirmed through various sources that the email was, in fact,

28   Meta's.

**VERIFIED COMPLAINT**

8.      The removal of Reely – Sarafan's most popular and profitable app – from Google Play has had devastating consequences for Sarafan. It eliminated a critical revenue stream, shattered investor confidence, and damaged relationships with customers and employees. The app's removal hindered Sarafan's ability to fulfill contractual obligations, leading to significant financial losses and reputational harm.

9.      Google and Meta's actions exemplify the broader pattern of unfair, inconsistent enforcement and opaque decision-making that plagues the app development ecosystem. By unilaterally deciding the fate of apps without providing developers a meaningful opportunity to address and resolve complaints, these tech giants wield absolute power over the livelihoods of developers and the viability of their businesses.

10.     This lawsuit seeks to hold Google and Meta accountable for the arbitrary and unfair application of their power to destroy independent developers. Sarafan seeks a judicial determination that it did not breach any agreements with Google, an order to reinstate Reely on Google Play, and compensation for the extensive damages incurred due to Google and Meta's wrongful actions. Additionally, Sarafan seeks a declaratory judgment that it does not infringe any of Meta's statutory or common-law trademark rights.

**PARTIES**

11.     Plaintiff Sarafan is a Hong Kong corporation formed and existing under the laws of Hong Kong, with its principal place of business in Hong Kong.

12.     Defendant Google is a Delaware limited liability company headquartered and doing business under the laws of the state of California, with its principal place of business in Mountain View, California.

13.     Defendant Meta is a Delaware corporation headquartered and doing business under the laws of the state of California, with its principal place of business in Menlo Park, California.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest, costs, and

**VERIFIED COMPLAINT**

attorney's fees, and because there is complete diversity between the parties, as this is an action between citizens of different countries. Plaintiff Sarafan is a citizen of Hong Kong and Defendants are both U.S. entities and are residents in California.

15.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 insofar as this action asserts claims, as to Defendant Meta, arising under federal law, namely the Lanham Act. This Court has supplemental jurisdiction over state and common law claims pursuant to 28 U.S.C. § 1367.

16.     Google is subject to personal jurisdiction in this Court pursuant to California Code of Civil Procedure Section 410.10 because Google is a citizen of or domiciled in California, operates from its principal place of business in California, maintains substantial or continuous and systemic contacts with California, has purposefully availed itself of the economic benefits of transacting business in California, and has committed the tortious acts alleged in this Complaint in California.

17.     Meta is subject to personal jurisdiction in this Court pursuant to California Code of Civil Procedure Section 410.10 because Meta is a citizen of or domiciled in California, operates from its principal place of business in California, maintains substantial or continuous and systemic contacts with California, has purposefully availed itself of the economic benefits of transacting business in California, and has committed the tortious acts alleged in this Complaint in California.

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because both Google and Meta are both located in this District and a substantial part of the events or omissions giving rise to Sarafan's claims occurred in this District.

19.     For the same reasons mentioned in the paragraphs above, the Divisional Assignment is also proper pursuant to Local Rule 3-5(b).

## FACTS

### I.     Sarafan and Reely

20.     Sarafan, a small, privately owned entity, develops software applications (known as "apps") for use on smartphones and tablets and distributes them via major marketplaces such as

**VERIFIED COMPLAINT**

1    Apple's App Store and Google Play.

2        21.    Sarafan's apps are designed for use by individuals and businesses to help them

3    "create amazing photos and videos."

4        22.    Sarafan's apps are developed using its own proprietary technology specifically

5    designed for processing and enhancing photo and video files, ensuring a unique customizable

6    experience for users.

7        23.    Prior to Google terminating its account, users downloaded Sarafan's apps from

8    Google Play approximately 50,000 times a month.

9        24.    Sarafan's most popular app is called Reely: Reels Maker, Templates. The Reely

10   app uses the following icon:

11
12
13   
14
15
16

17       25.    On March 6, 2024, Sarafan filed two use-based applications to register REELY as

18   a standard-character trademark and the Reely app icon as a design trademark with the U.S. Patent

19   and Trademark Office ("USPTO") for "Downloadable mobile application for editing digital

20   photos and videos; Downloadable mobile application for editing digital photos and videos for

21   social media reels." The USPTO assigned Reely application Serial Nos. 98436848 and 98436893,

22   respectively. Copies of these trademark applications and the filed specimens are attached as

23   **Exhibit A**.

24       26.    Sarafan promoted its Reely app as follows:

25           Reely is a video editing app that lets you create captivating Reels
             with just a few taps. The app comes with a wide range of templates,
26           from the latest trends to personal videos. All you need to do is
             select a template, customize it to your liking, add your photos or
27           videos, and then you're done. You can also duplicate clips and
             replace photos with ease. And with the app's intuitive interface, you
28           can create your Reel in no time.

---

5

**VERIFIED COMPLAINT**

27.     Customers entered into subscription contracts with Sarafan by purchasing subscriptions through the application's paywall. Upon purchase, customers accepted the Terms and Conditions and Privacy Policy, which served as the relevant contracts between Sarafan and its customers. Sarafan's apps, including Reely, were free to download and use, but also offered various paid features via subscription plans.[1] Customers could purchase a weekly subscription for $5.99 per week, a yearly subscription for $29.99 per year, or a lifetime subscription for $49.99. Copies of the paywall for Reely,[2] its Terms and Conditions, and Privacy Policy are attached as **Exhibit B**.

28.     At the time of Reely's removal from Google Play, Reely had been downloaded 681,638 times, and Sarafan had 4,268 contracts with customers. Copies of the Apphud [3] webpages showing the number of downloads, paying customers, proceeds, and revenues are attached as **Exhibit C**.

29.     User retention for Reely was outstanding, with its retention rates being nearly 70%. Copies of the Google Analytics webpages showing Reely's retention rate are attached as **Exhibit D**.

30.     According to AppMagic,[4] Reely enjoyed a user rating of 4.4 stars, with over 27,000 reviews before its removal from Google Play. The app's impressive retention rates and stellar reviews underscore the significant engagement and value Sarafan's applications offer, demonstrating consistent user satisfaction and loyalty. A copy of the AppMagic webpage showing Sarafan's ratings is attached as **Exhibit E**.

**II.     Defendants' Knowledge of Sarafan's Contracts**

31.     Google had actual knowledge of Sarafan's contracts with its customers, as Google

---

[1] Reely offered an annual, weekly, and lifetime subscription.
[2] The prices shown on the paywall are in Chilean pesos, the prices have been converted to dollars in the preceding paragraph.
[3] Apphud is a platform that helps developers manage and analyze in-app purchases and subscriptions.
[4] AppMagic is a website that provides detailed analytics and insights into mobile app performance, including downloads, revenue, and user demographics, to help developers and marketers track and optimize their apps' success.

**VERIFIED COMPLAINT**

Play Console[5] provided detailed information about them. As the data provider, Google was aware that Reely had been downloaded over 680,000 times and had over 4,000 paying customers. Google Play Console also provided Sarafan with reports detailing all customer payments. This demonstrates that Google was fully aware of Sarafan's customer base, as it directly processed and tracked payments made by these customers. This information was available in the Google Play Console, but access is now restricted. A screenshot of Reely's suspended Google Play Console page is attached as **Exhibit F**. However, this information is still available on Apphud. *See* **Exhibit C**.

32.     Lastly, Google provided Sarafan with information regarding its retention rate for customers via Google Analytics. *See* **Exhibit D**. Google Analytics provided detailed information regarding Sarafan's customers, such as the number of users by country and city, the number of active users in the last 30 minutes, the main languages of the users, and the total number of users. *Id.*

33.     While Reely was active, Sarafan paid Google a total of $35,252.58 in fees, comprising nearly 30% of all the proceeds Sarafan generated from Google Play. *See* **Exhibit C**.

34.     Google also had constructive knowledge of Sarafan's contracts with its customers. Sarafan made several updates to its applications, all of which were reviewed and approved by Google.[6] Google had access to records and other data identifying Sarafan's customers who purchased Sarafan's Reely app through Google Play. Copies of GitHub pages with developer comments on Sarafan's application updates are attached as **Exhibit G**.

35.     Further, Google could see the ratings and reviews for Sarafan's apps, indicating a robust customer base and active user engagement.

36.     For its part, Meta had actual knowledge of Sarafan's contractual relationship with Google. On July 3, 2024, Seraleev sent emails to Meta, as well as Meta's trademark enforcement

---

[5] Google Play Console is a platform that allows developers to manage and monitor their apps on the Google Play Store, providing tools for publishing, analytics, user feedback, and app performance tracking.

[6] https://support.google.com/googleplay/android-developer/answer/9859654?hl=en#:~:text=Depending%20on%20your%20app's%20update,t%20sent%20for%20review%20automatically.

**VERIFIED COMPLAINT**

division, including Korto Lyons, IP/DNS Enforcement and Protection Manager; Margie Milam, IP Enforcement and DNS Policy Lead; and Natalie Leroy, DNS and IP Enforcement Manager. These emails informed Meta that Reely had been removed from Google Play due to Meta's trademark complaint. This communication clearly indicated that Sarafan had an existing contractual relationship with Google, as the app's presence on Google Play was contingent upon such a contract. Meta's awareness of the app's removal due to a trademark issue further underscores its knowledge of this relationship. Copies of these messages are attached as **Exhibit H**.

37.    Additionally, as detailed below, Sarafan either contacted Meta or was contacted by Meta several times. *See* **Exhibits K**, **S**, **V**, **W**, **X**, and **Z**.

38.    Meta also had actual knowledge of Sarafan's contracts with its customers. The same set of emails Seraleev sent on July 3, 2024, stated, "Many of my apps help Instagram users create photos and videos for your social network." These messages were sent to Meta's trademark enforcement division as well. *See* **Exhibit H**. This correspondence demonstrates that Meta was explicitly informed of the nature of Sarafan's business operations and its contractual relationships with its customers.

39.    In addition, Meta had knowledge of Sarafan's contracts with customers through Reely's Google Play page, which displayed the number of times Reely had been downloaded, the number of reviews it had, the average rating it received from users, and its pricing structure. *See* **Exhibit A**.

**III.    Google and Google Play**

40.    Google owns and operates Google Play, an app distribution platform and online marketplace for smartphones and other electronic devices that operate on the Android operating system.

41.    Google Play offers more than two million apps to its more than 2.5 billion monthly users across 190+ markets worldwide.[7] More than 90% of all Android-based apps that are

---

[7] https://www.statista.com/statistics/266210/number-of-available-applications-in-the-google-play-store/;
https://play.google.com/howplayworks/#:~:text=Google%20Play%20is%20an%20online,games%2C

**VERIFIED COMPLAINT**

downloaded onto a mobile phone are downloaded through Google Play, making Google Play an indispensable component of growth for any developer of Android apps.[8]

42.     To offer an app on Google Play, developers must agree to the terms and conditions outlined in Google's Developer Distribution Agreement ("DDA"). A copy of the DDA is attached as **Exhibit I**.

43.     Section 4 of the DDA outlines the terms and conditions governing a developer's use of Google Play, including the requirement that the developer adhere to the Developer Program Policies.

44.     The Developer Program Policies are accessible via a hyperlink in the DDA and can be found here: https://play.google/intl/en-US/developer-content-policy/.

45.     One of the key policies under the Developer Program Policies is the Intellectual Property ("IP") policy, which states:

> When developers copy someone else's work or deceive users, it hurts users and the developer community. Don't rely on misleading or unfair use of other people's work.

46.     Section 8 of the DDA outlines Google's right to "takedown" apps from Google Play if Google determines that an app or product offered by a developer violates applicable laws, the terms of the DDA, or any "applicable policies, or other terms of service, as may be updated in accordance with their terms."

47.     Specifically, at the time Sarafan agreed to the DDA, Section 8.3 stated:

> Google does not undertake an obligation to monitor the Products or their content. If Google becomes aware and determines that a Product or any portion thereof (a) violates any applicable law; (b) violates this Agreement, applicable policies, or other terms of service, as may be updated in accordance with their terms; (c) violates terms of distribution agreements with device manufacturers and Authorized Providers; or (d) creates potential liability for, or may have an adverse impact on, Google or Authorized Providers (for example, if a Product has an adverse economic, reputational or security-related impact); then Google may reject, remove, suspend, limit the visibility of a Product on Google Play, or reclassify the Product from Google Play or from Devices. Google reserves the

---

(continued…)

%20books%2C%20and%20more.
    [8] https://ec.europa/commission/presscorner/detail/en/IP_18_4581

**VERIFIED COMPLAINT**

right to suspend and/or bar any Product and/or Developer from Google Play or from Devices. If Your Product contains elements that could cause serious harm to user devices or data, Google reserves the right to disable the Product or remove it from Devices on which it has been installed. If Your Product is rejected, removed, or suspended from Google Play or from Devices pursuant to this Section 8.3, then Google may withhold payments due to Developer. For information about the appeal process if Your Product is subject to a Legal Takedown or has been removed or suspended, please see here.

48.    Google's takedown appeal process can be found on the Google support webpage, linked in the last sentence of Section 8.3 of the DDA: https://support.google.com/googleplay/android-developer/answer/9899142?hl=en-GB&%3Bref_topic=9877468.

49.    Unscrupulous competitors can and do make false complaints against others in order to take advantage of Google's unilateral and total authority to remove apps at its discretion. Filing a bogus claim against a competitor is a quick and easy "kill shot" if Google does not undertake appropriate diligence to resolve the complaint.

## IV.    Meta, Instagram, and Reels

50.    Meta owns and operates Facebook and Instagram, both of which are popular social networking platforms. Facebook and Instagram share similar functionalities, particularly video sharing.

51.    In November 2019, Meta's Instagram had begun to pilot a video feature known as "Reels."[9] Reels was similar to the popular Chinese video-sharing service, TikTok, allowing users to record short videos (also known as "reels") set to pre-existing sound clips.

52.    In August 2020, Instagram officially launched the Reels feature in 50 countries, including the United States,[10] and added the Reels button to the home page:



---

[9] https://techcrunch.com/201⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚s/?guccounter=1
[10] https://www.theverge.com/2020/8/5/21354117/instagram-reels-tiktok-vine-short-videos-stories-explore-music-effects-filters

**VERIFIED COMPLAINT**

53.     Meta also uses the term "reels" and the "clapboard design" on Facebook.

**V.     Removal of Sarafan's Reely App from Google Play**

54.     If a registered trademark holder believes an app or product listed on Google Play infringes its trademark, Google's policies allow the trademark holder to submit an online complaint to the Google Play Team, requesting the removal of the infringing app for violating the intellectual property policy outlined in Google Play's Developer Program Policies.

55.     When Google receives a trademark infringement complaint, the Google Play Team notifies the owner of the allegedly infringing app about it.

56.     On June 13, 2024, Sarafan received a notification from Google stating:

> Google has been notified that your app Reely: Reels Maker, Templates (com.sarafan.reely) allegedly infringes upon the trademark of other and may therefore be in violation of the Trademark policy. We have attached a copy of the original notice we received for your reference.
>
> . . .
>
> We encourage you to resolve this matter with the complainant directly. If you are unable to resolve this issue with the complainant, we may need to remove your app from the Google Play store. If you have any further concerns about this issue, please address them directly to the complainant in the Trademark Notice provided.

57.     The "Text Copy of complaint" section stated:

> Trademark Owner:
> Instagram LLC
>
> Complainant Email:
> enf.fbinstagram.2408046@enf-meta.com
>
> Complaint Details:
> The app uses, without authorization, the trademarks, logos, badges and/or banners of Instagram. In this case, the app uses the Trademarked Instagram Reels Logo in the app icon in a way that is confusingly similar or identical to Instagram's imagery.
>
> Trademarks:
> Reels Logo, US, 7020288

A copy of the email notification from Google is attached as **Exhibit J**.

58.     Although Sarafan disagreed with the merits of the complaint, it revised the Reely

app icon. On June 15, 2024, Sarafan updated Reely on Google Play. An image showing the changes Sarafan made to the Reely icon is attached as **Exhibit K**.

59.    On the same day, Sarafan informed Meta about these revisions and the updated app via email to the address provided in the complaint: enf.fbinstagram.2408046@enf-meta.com. A copy of this email is attached as **Exhibit L**. Sarafan received no response to this communication.

60.    On June 25, 2024, without any notice, further explanation, or an opportunity to address any alleged issues, Google removed Reely from Google Play. A copy of the removal notification is attached as **Exhibit M**.

61.    At the time Reely was removed from Google Play, Sarafan was in full compliance with all terms and conditions of the DDA.

**VI.    Sarafan's Attempts to Reinstate Reely**

62.    On June 25, 2024, Sarafan filed an appeal regarding its app's removal through Google's support webpage titled, "My app has been removed from Google Play" and "Manage policy violations."[11] The appeal was assigned the case number 30-1594951. Copies of the appeal and Google's response are attached as **Exhibit N**.

63.    That same day, Google rejected Sarafan's appeal without providing any explanation. The response stated: "You may contact the original complainant at the email address provided in your Google Play Trademark Notice. If the complainant responds to the original notice to authorize the republishing of your app, and your app does not otherwise violate the [DDA] and Content Policy, we will reinstate the app." *See id***.**

64.    Unsatisfied with Google's response, Sarafan instructed its counsel to file a complaint with Google against Meta's Instagram app. As detailed below, Meta does not properly use its clapboard design or the term "reels" as trademarks. In contrast, Sarafan had proper use of its marks, REELY and the Reely app icon design. Therefore, it was Meta that was infringing Sarafan's trademark rights. Sarafan filed this complaint on June 27, 2024. A copy of Sarafan's

---

[11] https://support.google.com/googleplay/android-developer/answer/2477981?sjid=1444093498252150825-NA

**VERIFIED COMPLAINT**

complaint is attached as **Exhibit O**.

65.     In relevant part, the complaint stated:

> The Instagram app uses, without authorization, the trademarks, logos, badges and/or banners of Sarafan Mobile Limited. In this case, the app uses the Trademarked Reely Logo in the app description in a way that is confusingly similar or identical to Sarafan's imagery.

66.     Additionally, On June 27, 2024, Sarafan, through counsel, submitted another appeal regarding Reely's removal, which was assigned case number 54-1595488. A copy of the appeal and Google's response is attached as **Exhibit P**.

67.     On June 27, 2024, Google responded to Sarafan's appeal, stating, "Despite modifications to your application, we are unable to reinstate your application. We are only able to accept a request for reinstatement of your application from the same contact who originally submitted the complaint to remove the application." A copy of this response and Sarafan's reply are attached as **Exhibit Q**.

68.     The same day, Sarafan's counsel replied, "The contact who submitted the complaint refuses to respond to our messages despite multiple attempts from our side. You take no action in cases like these, even when the complaint is clearly frivolous?" *See id.*

69.     On June 28, 2024, Google replied with a message that repeated verbatim the text of its previous response quoted in paragraph 67 above. A copy of this reply is attached as **Exhibit R**.

70.     On July 1, 2024, Google also responded to Sarafan's complaint against Meta, stating:

> As a preliminary matter, please note that Google is not in a position to mediate trademark disputes between developers and trademark owners. We have reviewed your submission, but are unable to determine the merits of your claim. As a result, we are unable to suspend the app at issue. If you have continued concerns, we encourage you to resolve the dispute with the developer. You may be able to contact the developer through the email address listed on the app page.

A copy of Google's response is attached as **Exhibit S**.

**VERIFIED COMPLAINT**

71.     Google's response demonstrated the blatant double standard it employs in handling complaints from large corporations versus independent developers. In the first instance, Google grants the complaint without independent evaluation and deletes the allegedly infringing app without providing a meaningful opportunity to challenge the decision. However, in the second instance, Google claims it is "not in a position to mediate trademark disputes between developers and trademark owners." Google thus aids and abets big corporations' abuse of their intellectual property rights in shutting down independent developers.

72.     At this point, it became clear to Sarafan that Google's appeal process was a sham, and Sarafan was likely interacting with an automated system rather than a person who could understand the substance of Sarafan's communications.

**VII.     Sarafan Ascertains the Authenticity of Meta's Complaint**

73.     On July 1, 2024, puzzled by Meta's lack of response to Sarafan's messages, Sarafan contacted Meta's developer support team to clarify whether the email address indicated in the Google Play Trademark Notice, enf.fbinstagram.2408046@enf-meta.com, in fact belongs to Meta. On July 2, 2024, Meta responded, stating:

> The email address enf.fbinstagram.2408046@enf-meta.com is not ours at all. It is a scam. We did not make any trademark complaint for your app, therefore this needs to be solved by Google's support, as we have no way to appeal your app since those platforms are not ours.
>
> . . .
>
> On our side, I can guarantee that that email address isn't from Meta.

A copy of Meta's response is attached as **Exhibit T**.

74.     On July 2, 2024, Sarafan contacted the Internet Corporation for Assigned Names and Numbers (ICANN), the organization responsible for maintaining the domain name system of the internet. Based on the information it received from Meta, Sarafan alerted ICANN to the apparent scam nature of the email address enf.fbinstagram.2408046@enf-meta.com. In response, ICANN stated that it cannot suspend domain names, but did provide several options for filing a complaint. A copy of ICANN's response is attached as **Exhibit U**.

75.     Also on July 2, 2024, Sarafan filed a new appeal with Google under case number

14

**VERIFIED COMPLAINT**

7-1596292 citing newly discovered information and attaching the message from Meta that stated that the email address enf.fbinstagram.2408046@enf-meta.com does not belong to it. On July 3, 2024, Google again responded with a boilerplate rejection identical in wording to the previous ones. A copy of the appeal and Google's response is attached as **Exhibit V**.

76.    On July 3, 2024, Sarafan filed a third appeal with Google under case number 22-1596513, including additional email addresses from the Google Legal Support Team and Meta's email address as listed in the Google Play Trademark Notice, enf.fbinstagram.2408046@enf-meta.com. Sarafan once again outlined the situation and the steps it had taken to resolve Meta's complaint. Given Google's repeated insistence that Sarafan "may contact the original complainant at the email address provided in your Google Play Trademark Notice," Sarafan stated in its message, "Enf-meta, I am asking you to respond." Meta did not respond. In its reply, Google merely directed Sarafan to "submit an appeal by using the appeal path provided in the notification you received about the restriction." A copy of the appeal and Google's response is attached as **Exhibit W**.

77.    Sarafan contacted the entity purporting to be Meta again on July 3, 2024, at the email address enf.fbinstagram.2408046@enf-meta.com. Sarafan highlighted the suspicious nature of the Google Play complaint against Sarafan and gave one final opportunity to respond. A copy of this message is attached as **Exhibit X**. Sarafan never received a response to this message.

78.    The same day, Sarafan also contacted the entity purporting to be Meta at the email address enforcement@enf-meta.com, asking it to investigate whether the Google Play complaint it received was part of a scam. Sarafan sent the same message via direct messages to Meta's IP enforcement employees, whose contacts Sarafan found on LinkedIn. Copies of these messages are attached as **Exhibit Y**. Sarafan never received any responses to these messages.

79.    Following ICANN's recommendations, Sarafan reached out to several other domain name registrars and hosting services providers regarding the ownership of the enf-meta.com domain name.

80.    On July 7, 2024, Sarafan received a response from RegistrarSEC, LLC. RegistrarSEC confirmed that it was the domain registrar for the enf-meta.com domain name and

**VERIFIED COMPLAINT**

that it had forwarded Sarafan's message to the domain registrant, Meta Platforms, Inc. A copy of this message is attached as **Exhibit Z**.

81.   On July 8, 2024, Sarafan received an email from the address domain@meta.com, stating, "We can confirm that the domain name <enf-meta.com> is a domain name that is owned by Meta Platforms, Inc. and is used by brand enforcement team." A copy of this message is attached as **Exhibit AA**.

**VIII.   Meta's Unfair Practices**

82.   Meta's method of prosecuting its intellectual property rights is the epitome of unfair competition. First, it filed a baseless complaint with Google, alleging that Reely infringed upon Meta's trademark.

83.   Second, it submitted the complaint using an email address that is not listed on Meta's official page titled "I've been contacted by a Meta representative. How do I know if the phone call and/or email I received is real?" This webpage states, "If someone contacts you saying they're from Meta, you can confirm if the representative is actually affiliated with Meta by checking their email address." This webpage provides a list of official domains used for emails from Meta, including:

facebookmail.com
facebook.com
instagram.com
fb.com
meta.com
metamail.com
support.facebook.com
business.fb.com

The domain enf-meta.com isn't among this list of official domains. The webpage showing the official email addresses Meta uses is attached as **Exhibit BB.**

84.   Third, when Sarafan inquired about the ownership of the enf-meta.com domain, Meta initially responded that it did not own the domain, guaranteed that the email address did not belong to Meta, and definitively stated that "It is a scam." *See* **Exhibit S**. This misled Sarafan and caused it to waste valuable time and resources to verify the accuracy of this information.

85.   Fourth, Meta demonstrated bad faith in not once responding to Sarafan's

communications aimed at resolving the dispute over its alleged intellectual property rights. In doing so, Meta deliberately abused the system Google put in place where, absent the complainant's consent, an allegedly infringing app cannot be reinstated to Google Play.

86.     Fifth, Meta engages in selective enforcement of its purported rights. It allows numerous apps incorporating or mimicking its clapboard design and the word "reels" to remain on Google Play and Apple's App Store unimpeded. Below is just a limited selection of such apps currently available for download on these platforms:

| Third-Party App | Google Play or App Store |
|---|---|
| Video Editor & Maker - InShot<br>InShot Video Editor<br>4.8 ★ | Google Play |
| JoyReels<br>JoyDream Limited<br>4.1 ★ | Google Play |
| MoboReels<br>MoboReader<br>4.6 ★ | Google Play |
| Reels Templates & M...<br>Video editor & audio trends | App Store |
| Reel Maker<br>Edit video with music edit... | App Store |
| Flix Reels Maker<br>Reels Templates. Create... | App Store |
| Reelsy Reel Maker Video Editor<br>Zed Italia Apps<br>4.1 ★ | Google Play and App Store |

**VERIFIED COMPLAINT**

| Third-Party App | Google Play or App Store |
|---|---|
| Wavify - Reels Maker<br>Technitoz Solution | Google Play |
| Reels Maker for Insta...<br>Video Templates with Mu... | App Store |

87.　The multitude of available reel-making apps allows Reely's customers, who are now unable to use Reely because of its removal from Google Play, to switch to competitors' apps. As a result, the longer Reely is absent from Google Play, the more difficult it would be for Sarafan to retain those customers and the more likely that its loss of market share in the reel-making segment would become permanent.

88.　Google's dispute resolution system in Google Play directly encourages abuse, especially by large corporations. When someone files a complaint against another app, Google grants the takedown request without evaluating the merits of the complaint. Google will only reconsider its action if the complainant withdraws its claim. However, once an app is terminated, the complainant has no incentive to withdraw the complaint or engage in any dialogue with the accused party.

89.　This is a common occurrence on Google Play. There are numerous instances of legitimate apps being taken down for no legitimate reason by scammers and large corporations filing frivolous complaints – sometimes with doctored evidence – and Google granting them.[12] The targets of these complaints then have no effective recourse because the complainants and Google ignore any attempts to provide a defense or rectify the issue.

## IX.　The Harm Defendants Have Caused Sarafan

90.　As a result of Reely's removal, all of Sarafan's more than 4,000 subscription customers have lost access to Reely and its features. Reely had 681,638 downloads, generating

---

[12]

https://www.reddit.com/r/androiddev/comments/yu2ch7/app_got_suspended_from_google_play_without/

**VERIFIED COMPLAINT**

1   monthly recurring revenues of more than $15,500.

2       91.    Reely was far and away Sarafan's highest-earning app. Published in May 2023,

3   Reely generated $86,117.64 by the end of 2023. In 2024, before being deleted less than halfway

4   into the year, Reely's total proceeds were at $37,560.28. Reely's monthly recurring revenue was

5   $15,592.80.

6       92.    Reely's total proceeds made up nearly 60% of Sarafan's total proceeds. Copies of

7   the Apphud webpages showing representative samples of Sarafan's apps' total proceeds are

8   attached as **Exhibit CC**.

9       93.    Google deleted Sarafan's most popular app without providing Sarafan with a

10  meaningful opportunity to challenge its business-killing decision.

11      94.    Google is a dominant and controlling player in the mobile app industry, hosting

12  more than 2 million apps and serving a user base of 2.5 billion.[13]

13      95.    Google's unwarranted deletion of Reely had – and continues to have – a

14  devastating impact on Sarafan.

15      96.    Google had actual knowledge of Sarafan's employment contracts, as Google Play

16  Console provided access to information about all Sarafan's employees through the users and

17  permissions section. In addition to four freelancers, the team working on Reely included three

18  full-time developers. Sarafan's development team is composed of three Ukrainian developers –

19  two refugees currently living in Slovenia and one residing in Kyiv. Copies of the Google Play

20  Console webpage showing Sarafan's employees are attached as **Exhibit DD**. Additionally, on

21  April 14, 2022, Google emailed all three developers invitation links to join Sarafan's Google Play

22  Console account. Representative samples of these emails are attached as **Exhibit EE**.

23      97.    Google also had actual knowledge of Sarafan's agreements with its shareholders.

24  This is confirmed by letters Google sent Sarafan on March 1 and 7, 2024. In these letters, Google

25  requested documents about Sarafan's shareholders in order to verify Sarafan's developer account.

26  Google requested and received government-issued identity documents for each of the beneficial

27               13

28  https://play.google/howplayworks/#:~:text=Google%20Play%20is%20an%20online,games%2C%20books%2C%20and%20more.

1    owners of Azur Games Global Limited ("Azur"), one of Sarafan's shareholders. Copies of these

2    letters are attached as **Exhibit FF**. Only after a detailed review of Sarafan's shareholder structure

3    did Google allow Sarafan to continue its work.

4           98.    Before Reely's removal from Google Play, Sarafan had no trouble securing money

5    from investors. One notable example is the convertible loan agreement Sarafan entered into with

6    Azur, in which Azur transferred $400,000 to Sarafan. A copy of this agreement is attached as

7    **Exhibit GG**.

8           99.    Azur also holds a 25% stake in Sarafan, reflecting its confidence in Sarafan's

9    integrity and ability to consistently produce excellent applications. A copy of the agreement

10   showing that Azur owns 25% in Sarafan is attached as **Exhibit HH**. After Reely's deletion,

11   however, without its most popular app available on Google Play, Sarafan's valuation plummeted,

12   and the company was not able to raise new capital.

13          100.   Almost immediately after Reely's deletion, Sarafan's customers from around the

14   world reached out in droves, expressing their confusion, frustration, and deep disappointment in

15   not being able to access Reely.

16          101.   A common complaint was that customers who had paid for subscriptions had lost

17   access to Reely, directly interfering with their expected use and benefits under their agreements

18   with Sarafan. The removal of Reely caused significant harm not only to Sarafan but also to its

19   loyal customers. A selection of the messages Sarafan's customers sent in the wake of the

20   termination is attached as **Exhibit II**.

21          102.   The termination of Sarafan's account also harms Google itself, which can no

22   longer enjoy the user goodwill generated by having Sarafan's popular Reely app in Google Play

23   or collect fees from the subscriptions Sarafan sold to its customers. As mentioned, Google made

24   over $35,252.58 from Sarafan in fees during the time its account was active.

25   **X.    Meta's Trademarks Should be Cancelled**

26          103.   Meta's trademarks relevant to this action should be canceled due to their lack of

27   distinctiveness and improper use.

28          104.   Meta's U.S. Trademark Registration No. 7,020,288 for the clapboard design

20

**VERIFIED COMPLAINT**

should be cancelled because the design, as used by Meta on its Instagram platform in the specimens submitted to the USPTO, fails to function as a service mark. A copy of the specimens, which are part of the record of the application that resulted in Registration No. 7,020,288, are attached as **Exhibit JJ**.

105.    Additionally, the clapboard design in Registration No. 7,020,288 is merely descriptive of the underlying services, and Meta has not claimed that it has acquired secondary meaning. The design is therefore not a valid service mark.

106.    The mark in Registration No. 7,020,288 is non-distinctive and incapable of identifying a single source of services.

107.    The consuming public does not, and will not, rely on the icon or home button for Reels as identified by Registration No. 7,020,288 to identify the services of any single company or individual. Moreover, the design is buried among other material on the screen (text, videos, etc.) and does not stand out from the rest of the other material displayed on the screen, as a valid trademark or service mark should.

**VERIFIED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14



Instagram Reels button at the bottom

15   Therefore, Meta is not entitled to maintain Registration No. 7,020,288 with its presumption of

16   exclusive rights.

17        108.   Sarafan has been harmed by the continued registration of this mark. The ongoing

18   registration interferes with Sarafan's use of its own mark, the icon for its Reely app, and

19   improperly allows Meta to assert exclusive rights to the purported mark.

20        109.   Meta has never used the clapboard design as a trademark or service mark, as

21   registered, in commerce.

22        110.   Accordingly, the Court should enter an order directing the USPTO to cancel U.S.

23   Trademark Registration No. 7,020,288.

24        111.   Meta's U.S. Trademark Registration No. 7,204,241 for the standard-character

25   mark REELS should also be cancelled because the term "reels," as used by Meta on its Instagram

26   platform and as shown in the specimens submitted by Meta to the USPTO, fails to function as a

27   trademark or service mark. A copy of the specimens, which are part of the record of the

28   application that resulted in Registration No. 7,204,241, are attached as **Exhibit KK**.

**VERIFIED COMPLAINT**

112.   In addition, the term "reels" in Registration No. 7,204,241 is generic or merely descriptive, at best, of the underlying goods and services, and is therefore not a valid trademark or service mark. A screenshot from the online Cambridge English Dictionary defining "reel" as "a short video posted on a social media website" is attached as **Exhibit LL**.

113.   In fact, Meta itself uses the terms "reel" and "reels" generically or descriptively on Facebook, as evidenced below:



114.   The mark in Registration No. 7,204,241 is non-distinctive and incapable of identifying a single source of goods and services. Therefore, Meta is not entitled to maintain Registration No. 7,204,241 with its presumption of exclusive rights.

115.   Sarafan is likely to be damaged by the continuing registration of Meta's REELS mark because continued registration of the mark may interfere with use by Sarafan of its REELY mark (as the name for its Reely app) and improperly permits Meta to assert exclusive rights in the purported mark.

116.   Accordingly, the Court should enter an Order directing the USPTO to cancel U.S. Trademark Registration No. 7,204,241.

### COUNT I
**Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**
**(Against Google)**

117.   In California, an implied covenant of good faith and fair dealing is included in every contract, which requires the parties to the contract to refrain from acts and omissions which may foreseeably and unfairly deprive a party of the benefits of the bargain. Even when a contract grants discretion to one party, that discretion must still align with the reasonable expectations of both parties.

118.   Sarafan and Google are parties to the DDA, which is a valid and binding contract.

119.   Sarafan fully performed its obligations under the DDA.

120.   Google breached the implied covenant of good faith and fair dealing in the parties'

1   agreement by removing Reely from Google Play in bad faith and without justification, by abusing

2   the discretion afforded to Google with respect to app takedowns under § 8.3 of the DDA, and

3   through its bad-faith and unjustified determination that Sarafan's use of the Reely app violated

4   one or more of Google Play's Developer Program Policies.

5        121.   Sarafan is entitled to damages proximately caused by Google's breach in an

6   amount to be determined at trial.

7        122.   Sarafan is entitled to a declaration that the use of its Reely app and the Reely

8   design mark does not violate the terms of the DDA.

9   **COUNT II**
**Intentional Interference with Contractual Relations**

10   **(Against All Defendants)**

11        123.   At all times relevant to the allegations in this Complaint, Sarafan had valid

12   contracts with its existing customers whereby Sarafan agreed to provide its apps and Sarafan's

13   customers agreed to pay Sarafan for them.

14        124.   At the time of termination, Sarafan had contracts with 4,268 paying customers.

15        125.   At the time of termination, Sarafan had agreements with Azur.

16        126.   At the time of termination, Sarafan had agreements with its employees and

17   contractors.

18        127.   Both Defendants were aware of these contracts and that Sarafan generated

19   revenues through its use of Reely.

20        128.   At all times relevant to the allegations in this Complaint, Google had access to

21   records and other data identifying Sarafan's customers that purchased Sarafan's Reely app

22   through Google Play.

23        129.   At all times relevant to the allegations in this Complaint, Meta was aware that

24   Sarafan had a contractual relationship with Google under the DDA.

25        130.   Defendants' conduct prevented Sarafan from performing under its contracts.

26   Indeed, Google, upon the improper and unfounded notice of violation claimed by Meta,

27   unilaterally and abruptly removed Sarafan's Reely app without justification and prevented

28   Sarafan from delivering Reely and its functionalities to the existing customers through Google

24
**VERIFIED COMPLAINT**

1   Play, thus disrupting its contracts with those customers.

2       131.   Defendants' conduct also disrupted Sarafan's contracts with its employees and

3   contractors, as it instantly destroyed a revenue stream of over $15,500 per month that Sarafan

4   relied on to fund its business operations, including paying its employees and contractors.

5       132.   Defendants intended to disrupt the performance of these contracts or knew that

6   disruption of performance was certain or substantially certain to occur. Google controls Google

7   Play and was aware that Sarafan is an app developer whose business model and revenue streams

8   depend on the availability of its Reely app on Google Play and its functionalities. Meta was aware

9   that Sarafan had contracts with its customers, employees, and Google and knew and intended that

10   the removal of Reely from Google Play would disrupt those contracts.

11       133.   The acts of Defendants caused an actual disruption of Sarafan's contractual

12   relationship with customers because the unjustified removal of Reely from Google Play prevented

13   those customers from using Reely which, in turn, decreased Sarafan's revenue, market share, and

14   goodwill.

15       134.   Sarafan's agreements with its employees were also disrupted as a result of

16   Defendants' conduct.

17       135.   As a direct and proximate result of Defendants' conduct, Sarafan experienced lost

18   revenue and other business losses, damage to its reputation and goodwill, additional labor costs,

19   and legal fees and costs.

20       136.   Defendants' conduct was a substantial factor in causing Sarafan harm.

21       137.   Google did not have a legitimate business purpose when it removed Sarafan's

22   Reely app from Google Play. Google's discretion is not an absolute defense against interference

23   claims, as the "determinative question"[14] is whether the party acted in good faith. Google has not

24   acted in good faith and has treated Sarafan unfairly by giving preference to Meta's

25   unsubstantiated allegations of infringement and ignoring Sarafan's explanations. Moreover,

26   Google withdrew itself from resolving the dispute between its customer, Sarafan, and Meta.

27       [14] *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979); *see also Webber v. Inland*

28   *Empire Invs.*, 74 Cal. App. 4th 884, 902 (1999); *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1274 (N.D. Cal. 2022).

**VERIFIED COMPLAINT**

138.    Google acts on trademark infringement complaints received from Meta, but ignores complaints filed by small players such as Sarafan.

139.    Meta did not have a legitimate business purpose when it filed its complaint against Sarafan's Reely app. Meta did not act in good faith when it provided an email address in its complaint that it later claimed did not belong to it. Meta further refused to respond to Sarafan's inquiries and proposals to resolve any differences outside the formal proceedings.

140.    Defendants' actions were willful, wanton, malicious, and oppressive, and undertaken with knowledge of their illegality, thus justifying an award of exemplary and punitive damages in an amount to be determined at trial to punish and to serve as an example to others to deter such conduct.

141.    Sarafan is entitled to damages for past and present harm as well as injunctive relief to restrain Defendants from interfering with its contractual relationships.

**COUNT III**
**Intentional Interference with Prospective Economic Advantage**
**(Against All Defendants)**

142.    Sarafan had a recurring monthly revenue of $15,592.80 from its premium subscriptions for its Reely app, establishing an economic relationship with the probability of future economic benefit between Sarafan and the owners of Android-based mobile devices who wanted to download the Reely app on Google Play.

143.    Both Defendants were aware of the prospective relationship between Sarafan and the owners of Android-based mobile devices who wanted to download the Reely app on Google Play.

144.    Meta intentionally and without justification or excuse interfered with Sarafan's economic relationship with owners of Android-based mobile devices who wanted to download Reely on Google Play by taking the actions described above, which include submitting a false, improper, and unfounded complaint to Google Play.

145.    Google, acting by and through its employees on the Google Play Team, intentionally and without justification or excuse interfered with Sarafan's economic relationship with owners of Android-based mobile devices who wanted to download Reely on Google Play by

26
**VERIFIED COMPLAINT**

1   taking the actions described above, which include abusing its discretion to take down non-

2   compliant apps under § 8.3 of the DDA, violating the implied covenant of good faith and fair

3   dealing contained in the DDA, prohibiting Sarafan from offering the Reely app for download on

4   Google Play without justification while allowing other developers to list apps using the formative

5   terms "reel" or "reels" and the clapboard design, and taking adverse action against Sarafan, at the

6   behest of developers or parties who compete with Sarafan, including Meta itself.

7        146.   Defendants' actions directly interfered with the economic relationship between

8   Sarafan and Android-based mobile device owners who wanted to download Reely from Google

9   Play. During the periods when Reely was removed from Google Play – and continuing to this day

10  – Reely has been completely unavailable for download and use.

11       147.   At all times relevant to the allegations in this Complaint, Sarafan had economic

12  relationships with each of its customers and investors that had resulted in, and would have

13  continued to result in, an economic benefit to Sarafan.

14       148.   Defendants knew of the business relationships Sarafan had with its customers,

15  investors, and employees.

16       149.   By engaging in the above-referenced conduct, Defendants intended to disrupt

17  Sarafan's business relationships with its customers, investors, and employees or knew that

18  disruption of those business relationships was certain or substantially certain to occur.

19       150.   As a direct and proximate result of Defendants' conduct, Sarafan's business

20  relationships were disrupted, and Sarafan was harmed by lost revenue and other business losses

21  and suffered damage to its reputation and goodwill, additional labor costs, and legal fees and

22  costs.

23       151.   Defendants' conduct was a substantial factor in causing Sarafan harm.

24       152.   Defendants' actions as alleged herein were willful, wanton, malicious, and

25  oppressive and were undertaken with knowledge of their illegality, thus justifying an award of

26  exemplary and punitive damages in an amount to be determined at trial to punish and to serve as

27  an example to others to deter such conduct.

28

**VERIFIED COMPLAINT**

1
2

**COUNT IV**
**Negligent Interference with Prospective Economic Advantage**
**(Against All Defendants)**

3       153.    At all times relevant to the allegations in this Complaint, Sarafan had economic

4   relationships with each of its customers, investors, and employees that had resulted in, and would

5   have continued to result in, an economic benefit to Sarafan.

6       154.    Defendants knew or should have known of the business relationships Sarafan had

7   with its customers, employees, and investors. As a result of the DDA between Sarafan and

8   Google, Sarafan was the beneficiary of its agreement with Google, and a special relationship

9   between the parties existed such that Google owed Sarafan a duty to act with reasonable care.

10      155.    Defendants knew or should have known that these relationships would be

11  disrupted if Defendants failed to act with reasonable care.

12      156.    Defendants failed to act with reasonable care by engaging in the conduct described

13  in this Complaint.

14      157.    Assuming that the trier of fact finds that Google did not intentionally and in bad

15  faith remove Reely from Google Play and then refused to properly restore it, Google was

16  negligent in so removing Reely, failing and refusing to give Sarafan a full and fair opportunity to

17  resolve the purported dispute with Meta, refusing to allow Sarafan to meaningfully participate in

18  Google's appeal procedure, and refusing to restore Reely to Google Play.

19      158.    Assuming that the trier of fact finds that Meta did not intentionally and in bad faith

20  file an improper and unfounded trademark complaint with Google, Meta was negligent in

21  refusing to work with Sarafan to resolve the purported dispute and refusing to withdraw its

22  improper and unfounded trademark complaint from Google.

23      159.    As a direct and proximate result of Defendants' conduct, Sarafan's business

24  relationships were disrupted, and Sarafan experienced lost revenue and other business losses,

25  damage to its reputation and goodwill, additional labor costs, and legal fees and costs.

26      160.    Defendants' conduct was a substantial factor in causing Sarafan harm.

27
28

**VERIFIED COMPLAINT**

**COUNT V**
**Violations of Cal. Bus. & Prof. Code § 17200, et seq.**
**(Against All Defendants)**

161.   California Business & Professions Code Section 17200, et seq., prohibits Defendants from engaging in unlawful, unfair, or fraudulent business practices ("Unfair Competition Law"). Defendants' conduct constitutes unlawful or unfair acts prohibited by the Unfair Competition Law.

162.   Sarafan has suffered injury in fact and has sustained lost revenue, other business losses, and damage to its reputation and goodwill, additional costs for labor, and legal fees and costs because of Defendants' unlawful and unfair business acts or practices.

163.   Specifically, Sarafan developed and distributed Reely on Google Play, and Defendants' conduct has unreasonably restricted Sarafan's ability to fairly compete in the relevant market with this product.

164.   Defendants' actions as described above, which include submitting an improper and unfounded complaint by Meta to the Google Play Team about Reely, Google's violating the implied covenant of good faith and fair dealing contained in the DDA and otherwise breaching the DDA, and removing Reely from Google Play without justification and refusing to reinstate Reely without a meaningful appeal process and Defendants' ignoring Sarafan's inquiries and proposals, each constitutes an act prohibited by the UCL.

165.   Sarafan does not have an adequate remedy at law and requires equitable relief. Without reinstating Reely on Google Play, Sarafan is blocked from reaching consumers who use Android-based mobile devices, constituting an irreparable injury as it prevents distribution to a significant portion of its potential customer base. This inability to distribute its Reely app on Google Play eliminates Sarafan's ability to compete within the Android ecosystem, which cannot be remedied through monetary damages alone.

166.   Additionally, the removal of Sarafan's Reely app from Google Play has caused substantial damage to its reputation and goodwill, resulting in a loss of trust and credibility among customers and investors. This reputational damage, which affects Sarafan's long-term business prospects, is not readily quantifiable or compensable with money damages, especially as

1  it impedes Sarafan's ability to develop apps for distribution on Google Play and attract new

2  investors.

3      167.   Sarafan is entitled to injunctive relief restraining Defendants from taking any

4  action to harm or interfere with Sarafan's business, and, in particular, requiring Google to

5  reinstate Reely on Google Play and restraining Defendants from taking any action to interfere

6  with Sarafan's lawful and legitimate right to distribute Reely on Google Play. Pursuant to

7  California Business & Professions Code Section 17205, all such remedies are cumulative to the

8  relief available under all other laws.

9                                    **COUNT VI**
                          **Declaratory Judgment of Non-Infringement**
10                              **(Against All Defendants)**

11     168.   Meta's baseless accusations of infringement have placed Sarafan in reasonable

12  apprehension of imminent suit and give rise to an actual and concrete controversy between the

13  parties as to whether the Reely design mark and the name of its app, Reely: Reels Maker,

14  Templates, infringe Meta's clapboard design mark and its REELS mark or any other mark in

15  which Meta purports to have rights.

16     169.   Accordingly, Sarafan seeks a declaratory judgment that it does not infringe any

17  statutory or common-law rights Meta may have in the clapboard design mark, the REELS mark,

18  or any other mark in which Meta purports to have rights.

19     170.   The Reely design mark, as used on Google Play and elsewhere, and as identified in

20  Sarafan's U.S. Trademark application for Reely (Serial No. 98-436,893), does not and is not

21  likely to cause confusion with Meta's clapboard design mark, referred to as the "Trademarked

22  Instagram Reels Logo" in Meta's Google Play Trademark Notice. Additionally, Sarafan's

23  common-law (unregistered) standard-character mark REELY, both on its own and as used in

24  connection with its Reely app, does not and is not likely to cause confusion with Meta's

25  registered REELS Mark.

26     171.   Sarafan is, therefore, entitled to a declaratory judgment that it does not infringe

27  any statutory or common-law trademark rights of Meta.

28

**VERIFIED COMPLAINT**

**COUNT VII**
**Cancellation of Trademark Registration Reg. No. 7020288**
**(15 U.S.C. § 1119)**
**(Against Meta)**

172.    Meta's U.S. Trademark Registration No. 7,020,288 should be cancelled because the clapboard design, as used by Meta on its Instagram platform and elsewhere and as shown in the specimens submitted by Meta to the USPTO, fails to function as a trademark or service mark. In addition, the clapboard design in Registration No. 7,020,288 is merely descriptive of the underlying services, and Meta has not claimed that it has acquired secondary meaning. The design is therefore not a valid trademark or service mark.

173.    The mark in Registration No. 7,020,288 is non-distinctive and incapable of identifying a single source of services.

174.    The consuming public does not (and will not) rely on the icon or home button for reels as identified by Registration No. 7,020,288 to identify the services of any single company or individual. Moreover, the design is buried among other material on the screen and does not stand out from the rest of the other material displayed on the screen, as a valid trademark or service mark should. Therefore, Meta is not entitled to maintain Registration No. 7,020,288 with its presumption of exclusive rights.

175.    Sarafan has been and is likely to continue being harmed by the ongoing registration of the mark in question, as it interferes with Sarafan's use of its own mark – the icon for its Reely app – and improperly allows Meta to claim exclusive rights to the disputed mark.

176.    Meta has never used the clapboard design mark as a trademark or service mark, as registered, in commerce.

177.    Accordingly, the Court should enter an order directing the USPTO to cancel U.S. Trademark Registration No. 7,020,288.

**COUNT VIII**
**Cancellation of Trademark Registration Reg. No. 7204241**
**(15 U.S.C. § 1119)**
**(Against Meta)**

178.    Meta's U.S. Trademark Registration No. 7,204,241 should be cancelled because the term "reels," as used by Meta on its Instagram platform and elsewhere, and as shown in the

31

**VERIFIED COMPLAINT**

specimens submitted by Meta to the USPTO, fails to function as a trademark or service mark. In addition, the term "reels" in Registration No. 7,204,241 is generic or merely descriptive, at best, of the underlying goods and services, and so is not a valid trademark or service mark.

179.   In fact, Meta itself uses the terms "reel" and "reels" generically or descriptively on Facebook, its other social networking platform.

180.   The mark in Registration No. 7,204,241 is non-distinctive and incapable of identifying a single source of goods and services. Therefore, Meta is not entitled to maintain Registration No. 7,204,241 with its presumption of exclusive rights.

181.   Sarafan is likely to be harmed by the continued registration of the REELS mark, as it interferes with Sarafan's use of its REELY mark as the name for its Reely app and improperly allows Meta to assert exclusive rights over the purported mark.

182.   Accordingly, the Court should enter an order directing the USPTO to cancel U.S. Trademark Registration No. 7,204,241.

## **REQUEST FOR RELIEF**

Plaintiff Sarafan requests:

(a)   on all counts, a preliminary and permanent injunction that restrains and enjoins Defendants, their agents, servants, employees, and all other persons in privity or acting in concert with them, from engaging in any conduct that interferes with the distribution of Sarafan's Reely app on Google Play and that compels Google to reinstate Reely on Google Play and Meta to withdraw its trademark infringement complaint from Google Play and not further interfere with the distribution of Reely on Google Play;

(b)   an award of compensatory and consequential damages in an amount to be proven at the time of trial or entry of judgment, plus accrued and accruing interest;

(c)   a declaratory judgment that Sarafan did not breach any of its agreements with Google;

(d)   a declaratory judgment that Sarafan's use of the Reely design mark and the standard-character mark REELY does not infringe any statutory or common-law

**VERIFIED COMPLAINT**

1     rights of Defendant Meta;

2     (e)     that the Court issue an order directing the United States Patent and Trademark

3             Office to cancel U.S. Trademark Registration Nos. 7,020,288 and 7,204,241;

4     (f)     pre- and post-judgment interest;

5     (g)     attorney's fees, expenses, and the costs of this action; and

6     (h)     all other and further relief as the Court deems necessary, just, and proper.

7

8     Dated: August 26, 2024                    Respectfully submitted,

9                                               NICHANI LAW FIRM

10

11                                              By: */s/ Vinod Nichani*_____
                                                    Vinod Nichani, SBN 277607

12                                              Counsel for Plaintiff
                                                SARAFAN MOBILE LIMITED

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED COMPLAINT**